PD

2:17-CV-3379

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ROBERT GUICE, STEVEN SCOTT, THOMAS PEDICORD, BERNARD TYNDALE, RANDY COLLIER, BENJAMIN HAYNES, et al.,

**(b)** County of Residence of First Listed Plaintiff   Outside this district
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Peter WInebrake/R. Andrew Santillo/Mark Gottesfeld, Winebrake & Santillo, LLC, 715 Twining Road, Suite 211, Dresher, PA 19025: (215) 884-2491.

## DEFENDANTS

DIRECTV, LLC and DIRECTSAT, USA, LLC

County of Residence of First Listed Defendant   Outside this district
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 2  U.S. Government Defendant
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ☒ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| | | | ❏ 790 Other Labor Litigation | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement Income Security Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❏ 895 Freedom of Information Act |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 896 Arbitration |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of State Statutes |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from Another District *(specify)*
- ❏ 6  Multidistrict Litigation - Transfer
- ❏ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
Fair Labor Standards Act, 29 U.S.C. § 201, et seq.

Brief description of cause:
Failure to pay for all hours worked and failure to pay proper overtime premium compensation

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ❏ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE   Diamond/Rice    DOCKET NUMBER   2:14-CV-4427

DATE   07/28/2017

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

JUL 28 2017

**PD**

**17  3379**

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _Altoona, Pennsylvania_

Address of Defendant: _El Segundo, California and King of Prussia, Pennsylvania_

Place of Accident, Incident or Transaction: _King of Prussia, Pennsylvania_
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))        Yes☐  No☐

Does this case involve multidistrict litigation possibilities?        Yes☐  No☐
RELATED CASE, IF ANY:
Case Number: _2:14-cv-4427_    Judge _Diamond/Rice_    Date Terminated: _9/7/16_

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☒  No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. _Federal Question Cases_:

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☒ All other Federal Question Cases
    (Please specify) _Fair Labor Standards Act_

B. _Diversity Jurisdiction Cases_:

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

## ARBITRATION CERTIFICATION
(Check Appropriate Category)
I, _R. Andrew Santillo_, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☒ Relief other than monetary damages is sought.

DATE: _7/28/17_        _____        _93041_
              Attorney-at-Law        Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _7/28/17_        _____        _93041_
              Attorney-at-Law        Attorney I.D.#

JUL 28 2017

CIV. 609 (5/2012)



**PD**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Robert Guice, et al.,
    v.

Direct V, LLC

:
:
:
:
:

CIVIL ACTION

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (✗)

7/28/17
**Date**

R. M A T
**Attorney-at-law**

Plaintiffs
**Attorney for**

215-884-2491
**Telephone**

215-884-2492
**FAX Number**

asantillo@winebrakelaw.com
**E-Mail Address**

(Civ. 660) 10/02

$400

**PD** **IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT GUICE, STEVEN SCOTT, THOMAS PEDICORD, BERNARD TYNDALE, RANDY COLLIER, BENJAMIN HAYNES, ZACHARY LAUDERMAN, ANTHONY DAVIS, SHANE HARRIS, BRIAN ELLIOTT, DAVID CROWLEY, COREY MARSH, ANDREW SINCLAIR, ATOY WILLIAMS, DAVE CRAWFORD, STEVE DICKSON, KENNETH PRESS, ERICK COLLINS, ANTONIO RUFFIN, ERIK WOLD, BRANDON WATSON, NICHOLAS AMBROSO, MARIO ROMERO, MICHAEL ERICKSON, GENE JOHN, MICHAEL LOGEMAN, FRANKLIN VELASQUEZ, CLIFTON RICE, JUSTIN HOLMAN, CARLOS BELTRE PEREZ, OLUWASEUN OGUNWUNMI, DANNY HILL, JOSEPH FAERBER, DANIEL BLANKENSHIP, CHAD MEDUKAS, LARRY VAN VLEET, PATRICK GORMAN, ALAN JACOBSON, RICHARD MUELLER, KEITH LEITZINGER, DAVID CROWLEY, TYRONE RASMUSSON, AARON HUNT, and JOHN PAGEL,** | **CIVIL ACTION** <br><br> **NO. _____ 17 _____ 3379** |
| **Plaintiffs,** | |
| **v.** | |
| **DIRECTV, LLC and DIRECTSAT, USA, LLC** | |
| **Defendants.** | |

**COMPLAINT**

Plaintiffs, by and through their undersigned counsel, for their individual complaints against DIRECTV LLC ("DIRECTV") and DirectSat, USA, LLC ("DirectSat") (collectively with DIRECTV, "Defendants") hereby state as follows:

## NATURE OF SUIT

1.      Plaintiffs worked as satellite television installation and service technicians. Plaintiffs' principal job duty as technicians was to install and service DIRECTV satellite television systems.

2.      DIRECTV controls and manages a nationwide corps of installation technicians in two ways: (1) by directly employing the technicians; and (2) by outsourcing technician labor through a network of service providers (the "Provider Network") consisting of Home Service Providers ("HSPs") like DirectSat.

3.      Plaintiffs were all acknowledged DirectSat employees.  Each Plaintiff also alleges that, as a matter of economic reality, they were also employed by DIRECTV.

4.      Defendants paid Plaintiffs on a piece-rate basis that did not properly compensate them for all of the hours they worked.

5.      Plaintiffs seek to recover unpaid wages and other applicable remedies under the Fair Labor Standards Act ("FLSA").

## PROCEDURAL HISTORY

6.      On March 2, 2010, Plaintiffs Jamie Arnold and Clinton Feger, on behalf of themselves and others similarly situated, filed a complaint against DIRECTV in the Eastern District of Missouri under case number 4:10-cv-00352.  They alleged that DIRECTV and the HSP that employed them failed to pay them all wages due in violation of the FLSA and sought to hold DIRECTV liable as a joint employer.

7.      On September 28, 2012, the *Arnold* court conditionally certified an FLSA collective action.  (Doc. No. 121).  After court-authorized notice was sent, many technicians

working in DIRECTV's Provider Network filed consents to become party plaintiffs in the *Arnold* case.

8.      After several years of litigation, on March 31, 2017, the *Arnold* court denied DIRECTV's motions for summary judgment, including on the questions of joint employment and whether the piece rate pay system complied with the FLSA.  (Doc. Nos. 472 and 473).

9.      On March 31, 2017, the *Arnold* court also granted DIRECTV's motion for decertification of the FLSA collective action, finding that individual issues among the plaintiffs precluded continuing to trial as a representative action.  (Doc. No. 474). The court tolled the plaintiffs' statutes of limitations for 120 days to permit plaintiffs to refile their individual claims.

## JURISDICTION, VENUE, AND JOINDER

10.      The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. 29 U.S.C. § 216(b).  Thus, this Court has subject-matter jurisdiction over Plaintiffs' individual FLSA claims under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

11.      DirectSat is a Delaware limited liability company with its principal place of business and corporate headquarters located in King of Prussia, Pennsylvania.  DirectSat is wholly owned by UniTek USA, LLC.  UniTek USA, LLC is Delaware limited liability company with its principal place of business in King of Prussia, Pennsylvania.  UniTek USA, LLC is wholly owned by Unitek Acquisition, Inc.  Unitek Acquisition, Inc. is a Delaware corporation with its principal place of business in King of Prussia, Pennsylvania. Unitek Acquisition, Inc. is wholly owned by UniTek Global Services, Inc.  UniTek Global Services, Inc. is a Delaware corporation with its principal place of business in King of Prussia, Pennsylvania.  Thus, this Court has personal jurisdiction over DirectSat.

12.     DIRECTV is registered to conduct business in Pennsylvania, operates warehouses, offices, and separate retail locations in Pennsylvania, and promotes, markets, and sells its satellite television service in this district.  DIRECTV further employs field operations managers who supervise DirectSat and DirectSat's technicians who install and service DIRECTV equipment in Pennsylvania.

13.     DIRECTV and DirectSat act together in Pennsylvania to establish, execute, and monitor the employment and pay policies giving rise to Defendants' liability herein.  Plaintiffs' piece-rate pay was calculated and distributed to Plaintiffs from DirectSat's offices in this district. Due to DIRECTV and DirectSat's joint employment of Plaintiffs, DIRECTV's liability is derivative of DirectSat's conduct in Pennsylvania.  Thus, this Court has personal jurisdiction over DIRECTV.

14.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1).  Venue is proper in this district for DIRECTV under 28 U.S.C. § 1391(c)(2) and (d) because DIRECTV is subject to this Court's personal jurisdiction with respect to the civil action in question.  Venue is proper with respect to DirectSat under 28 U.S.C. § 1391(c)(2) and (d) because DirectSat is headquartered in this judicial district.  Venue in this district is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district, and Defendants are each subject to this Court's personal jurisdiction.

15.     Joinder of the plaintiffs is proper because each of the Plaintiffs asserts a right to relief that arises out of the same series of transactions or occurrences and common questions of law and fact will arise in this action.  Fed. R. Civ. P. 20.

## DEFENDANTS

16.     DIRECTV, LLC is a California limited liability company with its principal place of business in El Segundo, California.  DIRECTV, LLC does business as DIRECTV Home Services.  DIRECTV, LLC is a wholly-owned subsidiary of DIRECTV Group Holdings, LLC. That is, DIRECTV Group Holdings, LLC owns 100% of the membership interest in DIRECTV, LLC.

17.     At all times relevant herein, Defendant DirectSat has been a Delaware limited liability company with its principal place of business in this district at King of Prussia, Pennsylvania.

## COMMON FACTUAL ALLEGATIONS
### DIRECTV's Provider Network

18.     DIRECTV operates its Provider Network nationwide with DirectSat serving as one its HSPs.  DIRECTV was the primary client of DirectSat and was the source of substantially all of its income.

19.     During the relevant time period, and as alleged in more detail below, DIRECTV merged with or acquired several HSPs.  DirectSat itself acquired one of DIRECTV's HSPs, Skylink Communications, Corp. ("Skylink"), in 2012.

20.     DIRECTV structured and operates its Provider Network as a top-down integrated organization. DIRECTV sits atop the Provider Network where it controls its HSPs with highly restrictive contracts.  DIRECTV's HSPs then engage two types of technicians—employees and subcontractors—to install and service DIRECTV systems.   The employee technicians, like Plaintiffs here, are nominally employed directly by the HSP (here DirectSat), but are economically dependent on DIRECTV and thus, under the FLSA, also employees of DIRECTV.

### DIRECTV's HSPs Are Not Independent

21.    Each HSP has the same contractual relationship with DIRECTV that unequivocally establishes DIRECTV as the dominant partner with the HSP relegated to the role of subordinate labor provider.  Virtually all of the contractual duties and obligations flow one way: from the HSP to DIRECTV.

22.    DIRECTV exerts significant control over and closely supervises its purportedly independent provider partners.  For example, DIRECTV has a hierarchy of field operations managers, senior field managers, a senior director, and a vice president whose role is to directly manage the HSPs, including DirectSat.

23.    The HSPs are economically dependent on DIRECTV, and DIRECTV regularly infuses the HSPs with what it labels internally as "extraordinary advance payments" in order to keep the HSPs' operations afloat while feigning an outward appearance of independence.  When litigation or other circumstances make the "independent" relationship no longer financially viable, DIRECTV simply acquires its subordinate HSPs entities. DIRECTV has provided DirectSat with several advance payments which were typically millions of dollars each.

24.    DIRECTV acquires its provider partners in a seamless process that requires little more than swapping out the names on a few contracts and resetting a few managers' titles.  The process does not require any of the structural modification or reorganization that normally accompanies an arm's length acquisition.  To date, there are only three "independent" HSPs still in operation—including DirectSat.  Since DIRECTV developed its Provider Network, DIRECTV or one of these three remaining HSPs has purchased at least thirteen prior HSPs.

6

## The Economic Reality: DIRECTV Employs Plaintiffs

25.     An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An employee may be employed by more than one employer at the same time. Employment status for purposes of wage and hour law is defined by the real economic relationship between the employer(s) and the employees.

26.     Through its Provider Network, DIRECTV establishes, defines, and controls the economic relationship between itself and its technicians. Among other indicia of employment described herein, DIRECTV controls the details of Plaintiffs' day-to-day work and the piece rate compensation method by which Plaintiffs are paid for their work.

27.     Every technician installing DIRECTV's satellite television equipment must do so according to the same policies, procedures, practices, and performance standards that DIRECTV alone establishes. DIRECTV's policies and procedures go beyond safety and quality assurance and dictate everyday work requirements such as Plaintiffs' appearance, clothing, and behavior.

28.     DIRECTV imposes its policies and procedures on Plaintiffs through the contracts it enters into with its HSPs. DIRECTV refers to the contracts it signs with HSPs as "Home Service Provider Agreements" ("HSP Agreements"). These HSP Agreements require HSPs to "pass down" DIRECTV's policies to their employee technicians like Plaintiffs.

29.     DIRECTV's HSP Agreements contain detailed requirements that enable it to control nearly every facet of Plaintiffs' work. DIRECTV promulgates detailed instructions from how Plaintiffs are to introduce themselves to customers, how they are to complete the installation, and what they are to wear.

30.     DIRECTV requires Plaintiffs to hold themselves out as agents of DIRECTV. For example, DIRECTV requires Plaintiffs to wear DIRECTV branded shirts, drive DIRECTV

7

branded vehicles, and show customers their DIRECTV branded ID cards.  DIRECTV refers to Plaintiffs as "the face of DIRECTV."

31.    DIRECTV issued a unique "Tech ID number" to each Plaintiff.  Using this Tech ID Number, DIRECTV tracks, amongst other things, when Plaintiffs arrive at a particular job, when Plaintiffs activate a customer's satellite equipment, and when Plaintiffs leave a particular job site.  DIRECTV also uses Plaintiffs' Tech ID numbers to track how customers rate Plaintiffs on DIRECTV's customer satisfaction surveys and how Plaintiffs perform on DIRECTV's performance metrics.

32.    DIRECTV exercises its control of Plaintiffs both directly through the policies described herein and indirectly through its agent and proxy, DirectSat.

33.    DIRECTV uses a database program known as SIEBEL to assign and deliver detailed "work orders" to Plaintiffs using their unique Tech ID number.

34.    Through its SIEBEL system, DIRECTV works in tandem with DirectSat to control who is permitted to perform DIRECTV's work.  DIRECTV can effectively terminate Plaintiffs' employment by ceasing to issue work to their Tech ID number.

35.    DirectSat performs middle-management functions between DIRECTV and Plaintiffs.  In this role, DirectSat works on DIRECTV's behalf to distribute DIRECTV's work orders to Plaintiffs and supervises Plaintiffs.  DIRECTV utilizes DirectSat's payroll system to administer paychecks to Plaintiffs; DirectSat utilizes revenue from DIRECTV, as well as DIRECTV's SIEBEL and other work order systems, to generate Plaintiffs' pay.

36.    DIRECTV sets forth hiring criteria for DirectSat's employees which DirectSat implements and enforces.  DIRECTV also sets the requirements for how DirectSat's technicians

perform their work.  DirectSat administers DIRECTV's required training regimen both when technicians are initially hired and throughout their employment.

37.     At all times relevant, DIRECTV retained the authority to terminate the employment of any technician employed by DirectSat.

38.     Both DIRECTV and DirectSat send personnel out to customers' residences to perform quality control surveys ("QCs") on Plaintiffs' work.  DIRECTV and DirectSat quality control personnel frequently perform their QCs while Plaintiffs are still performing the work at a customer's residence.  DIRECTV and DirectSat quality control personnel also conduct QCs after Plaintiffs have completed their work and have left a residence.  Defendants' quality control personnel sometimes require Plaintiffs to return or "rollback" to a job to assist a customer or bring their work into compliance with DIRECTV specifications.

39.     DirectSat holds weekly meetings between its supervisors, managers, and technicians.  DIRECTV managers frequently attend these meetings and sometimes directly address technicians, including Plaintiffs, regarding DIRECTV initiatives, technology, and performance metrics.

40.     DIRECTV regularly conducts audits of DirectSat's sites to ensure compliance with DIRECTV's contractual requirements.  These audits include inspection of DirectSat's employees, vehicles, and the personnel files that DirectSat maintains for each of its W-2 technicians.

41.     DIRECTV requires all technicians to pass a drug test, a background check, and obtain a certification from the Satellite Broadcasting & Communications Association ("SBCA") before DIRECTV will assign work orders to that technician.

9

42.     DIRECTV required DirectSat to provide Plaintiffs with ongoing training which typically included reviewing DIRECTV's written materials, watching DIRECTV's videos, and taking DIRECTV's tests in order to demonstrate Plaintiffs' knowledge of DIRECTV's policies and procedures.

43.     Plaintiffs typically start their workdays when they receive the work orders that DIRECTV assigns to them for that day.  During the relevant time period, Plaintiffs received DIRECTV's work orders through an electronic handheld device, email, or in hardcopy. Plaintiffs typically receive DIRECTV's work orders while they are at home or at DirectSat's warehouse.  Plaintiffs then review their work orders, look in their vehicles to determine if they have the equipment necessary to complete those work orders, and plan their driving routes. Plaintiffs then drive to DirectSat's warehouse to pick up equipment or attend a meeting, or drive directly to their first customer's residence.

44.     DIRECTV's work orders set out specific timeframes when Plaintiffs are supposed to be at a customer's residence, and they often prescribed the specific order in which Plaintiffs are to complete their work orders.  DIRECTV frequently assigns work orders to technicians one at a time and assigns those work orders based on the technician's proximity to "the next" work order, the technician's skills, and the technicians' schedule, all of which is maintained and tracked by DIRECTV.

45.     After completing a work order, DirectSat technicians, including Plaintiffs, frequently have to wait several minutes and sometimes more than an hour to receive their next assignment from DIRECTV.

46.     DIRECTV policy requires Plaintiffs to check in with DIRECTV when they arrive at a customer's residence.   After Plaintiffs check in with DIRECTV either through their

10

electronic handheld device or by calling DIRECTV directly, Plaintiffs attempt to make contact with the customer and complete the installation, service call, or upgrade. If a customer is not home, DIRECTV policy requires Plaintiffs to wait at the customer's home for 15–30 minutes and then hang a door tag on the customer's door. If the customer is home and all other preconditions are met, Plaintiffs complete the installation, service call, or upgrade to DIRECTV's standards and following DIRECTV's policies regarding customer service. While at the customer's residence, Plaintiffs contact DIRECTV to activate the customer's satellite system by either calling DIRECTV directly or through their electronic handheld device. DIRECTV policy then requires Plaintiffs to educate the customer for at least 30 minutes and have the customer sign paperwork. Plaintiffs then remove debris and equipment from the customer's residence. Once Plaintiffs have completed an appointment, they contact DIRECTV through the phone or their handheld device to inform DIRECTV that they are in route to the next appointment.

47.    After Plaintiffs leave a customer's residence, DIRECTV has customers complete a customer satisfaction survey regarding Plaintiffs' performance. DIRECTV's customer satisfaction surveys ask customers to rate Plaintiffs by such criteria as whether Plaintiffs showed the customer their DIRECTV ID badge and whether Plaintiffs appeared to be in a rush. The results of the DIRECTV's customer satisfaction surveys impact Plaintiffs' pay, training, and whether DIRECTV continues to issue work orders to Plaintiffs' Tech ID Numbers.

48.    Although DIRECTV controls nearly every aspect of Plaintiffs' work and is in frequent communication with Plaintiffs throughout every workday, DIRECTV disclaims any employment relationship with Plaintiffs. Employment status for purposes of wage and hour law,

however, is defined by the real economic relationship between employers and employees. The economic reality is that Plaintiffs are employed by both DIRECTV and DirectSat.

49.     DIRECTV's Provider Network is purposefully designed to carefully control the technicians installing its satellite systems while unlawfully circumventing the requirements of the FLSA.

### Defendants Do Not Pay Plaintiffs for All Hours Worked

50.     DIRECTV, through DirectSat, pays Plaintiffs using a piece-rate pay system. Under this system, Defendants pay Plaintiffs for completing certain enumerated "productive" tasks that DIRECTV has listed on a standardized rate card. Plaintiffs are not paid, however, for other indispensable tasks that are necessary to install and service DIRECTV satellite television service. Therefore, Defendants do not pay Plaintiffs for all of the work they do and hours they spend working for Defendants.

51.     Plaintiffs' piece-rate pay is calculated based on reports of completed work orders created and maintained by DIRECTV and provided to DirectSat.

52.     DIRECTV effectively controls Plaintiffs' pay through the common policies and practices it mandates in its HSP Agreements with DirectSat. DIRECTV internal documents demonstrate that DIRECTV understands that the amounts it pays to its HSPs, like DirectSat here, directly impacts how much money the technicians, like Plaintiffs, can make. Conversely, the amount of money DirectSat pays technicians like Plaintiffs is effectively capped by the amount DIRECTV pays DirectSat.

53.     Defendants pay Plaintiffs for completing specific line items that DIRECTV lists on its work orders. These line items include payment for installing a standard, high definition, KaKu, or other satellite dish and one receiver. Plaintiffs are also paid for certain additional

12

equipment that they install in a customer's residence. Plaintiffs are paid a set amount for service calls and upgrades.

54.     Defendants do not pay Plaintiffs for "non-productive" tasks such as driving to and between job assignments, receiving and reviewing schedules, calling customers to confirm appointments, obtaining required supplies, assisting other technicians, waiting between jobs, waiting for customers, maintaining and organizing work vehicles, and other indispensable tasks that are necessary to install and service DIRECTV satellite television service.

55.     Defendants do not pay Plaintiffs when a work order cannot be closed, regardless of the reason or how much time Plaintiffs spend on the particular job. DIRECTV will not allow a work order to "close," and thus does not pay Plaintiffs for their work on the work order, in a variety of circumstances, including if a customer has not paid a bill, if there is no line-of-sight from the customer's residence to DIRECTV's satellites, if the customer is not home, or if Plaintiffs are not able to get permission from the customer's landlord to mount a satellite dish.

56.     The FLSA permits employers to pay employees on a piece-rate basis as long as the employer pays for all hours worked, including non-productive hours, and pays a premium for hours worked over forty in a week, based on the employee's regular rate. *See* 29 U.S.C. § 207; 29 C.F.R. §§ 778.111, 778.318.

57.     An employer and employee may agree that the piece-rate pay compensates the employee for both productive and nonproductive hours, but the FLSA is not satisfied where the employer and employee do not make such an agreement. *See* 29 C.F.R. 778.318(c) (where it is "understood by the parties that other compensation received by the employee is intended to cover pay for such hours" . . . . "[I]f that is the agreement of the parties, the regular rate of the piece

worker will be the rate determined by dividing the total piece work earnings by the total hours worked (productive and nonproductive) in the workweek.").

58.     Plaintiffs and Defendants did not have an agreement or understanding that the pay Plaintiffs received for their productive tasks was also intended to compensate them for all the hours they spent working on nonproductive tasks.   To the contrary, Plaintiffs understood that they would not be paid for performing a number of required tasks for Defendants.   But such an agreement is not legal under the FLSA.   *See* 29 C.F.R. § 778.318(a).

### Plaintiffs' Overtime Premiums Are Miscalculated

59.     Plaintiffs, in many workweeks, worked more than 40 hours per week for Defendants.

60.     In addition to failing to pay Plaintiffs for many of the hours they work, Defendants also miscalculate Plaintiffs' regular rate of pay because Defendants do not pay Plaintiffs for all of the time they are working on Defendants' behalf.   Plaintiffs' regular rate of pay is unlawfully diminished by dividing Plaintiffs' total pay by the sum of the number of hours Plaintiffs spent performing tasks that they were paid for *and* the number of hours they were not paid for.   To comply with the FLSA, Defendants are required to calculate Plaintiffs' regular rate by dividing Plaintiffs' total pay by only the number of hours Plaintiff spent performing tasks that they were actually paid for.

### Defendants Willfully Fail to Keep Accurate Time Records and Encouraged Plaintiffs to Work Off-The-Clock

61.     The FLSA requires employers to maintain accurate time and other employment records related to their employees.   DIRECTV willfully fails to maintain these records for Plaintiffs in order to save on payroll and other costs.

14

62.     Defendants have instituted policies and procedures to encourage, and sometimes require, Plaintiffs to inaccurately record the number of hours that they work in a given week. For example, Plaintiffs were frequently required to write down on their time sheets that they took a break for lunch, regardless of whether Plaintiffs actually took an uninterrupted lunch break. Defendants also discouraged Plaintiffs from reporting all of their working hours (in particular, hours spent on nonproductive tasks) by telling Plaintiffs they would not receive additional work orders if they reported significant amounts of overtime.

63.     Defendants are, or should be, aware that Plaintiffs' supervisors frequently require or encourage Plaintiffs to inaccurately record their hours. Defendants are in frequent communication with Plaintiffs during the typical work day.  Plaintiffs often call their supervisors several times per day to troubleshoot problems and coordinate work orders.  Many Plaintiffs go into DirectSat's warehouse each workday.  Furthermore, DIRECTV policy requires Plaintiffs to contact DIRECTV directly, either through their electronic handheld device or via phone, at least three times for each work order they complete during the course of a day.

64.     DIRECTV keeps a work schedule for each Plaintiff that almost always exceeds 40 hours per week.  Additionally, DIRECTV's SIEBEL system keeps detailed time records of when Plaintiffs put themselves on site at a job, when they activate a job, and when they close a job. Both DIRECTV and DirectSat utilize DIRECTV's SIEBEL data to track when technicians get to their first assignment of the day and when they close their last work order of the day.

65.     Both DIRECTV and DirectSat use the data DIRECTV collects on each technician, including Plaintiffs, to evaluate each technician's performance according to DIRECTV's metrics.

15

66.     Both DIRECTV and DirectSat use DIRECTV's SIEBEL data to monitor how much work DIRECTV is assigning to each technician based on the "assigned durations" of technicians' work orders.  The assigned durations are DIRECTV's time estimates of how long a given work order should take based on the various time-and-motion studies that DIRECTV has commissioned over the years.

### Defendants' Policies and Practices Violate the FLSA

67.     Defendants' piece-rate pay system fails to comply with applicable law, and constitutes an effort to deliberately deny Plaintiffs earned wages and overtime compensation in violation of the FLSA.

68.     As a result, Plaintiffs were not paid for all of the overtime hours they worked, and the overtime hours that they were paid for were calculated using an improperly low regular rate in violation of the overtime provisions of the FLSA.

### PLAINTIFFS' CLAIMS

#### Plaintiff Robert Guice

69.     Plaintiff Robert Guice currently resides in Altoona, Pennsylvania.  Mr. Guice installed and serviced DIRECTV satellite systems in Pennsylvania from approximately May 2009 to October 2013.  Mr. Guice filed a consent to join the *Arnold* litigation on February 25, 2013.  Mr. Guice served as the DirectSat subclass representative in the *Arnold* action.

70.     In many of the weeks Mr. Guice worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 60 hours per week.  But Mr. Guice was not paid for all his working time.  Mr. Guice estimates that in a typical week he spent approximately 24 hours on work tasks that were not paid.

71.     Mr. Guice brings his claims against defendant DIRECTV.

**Plaintiff Steven Scott**

72.     Plaintiff Steven Scott currently resides in Philadelphia, Pennsylvania.  Mr. Scott installed and serviced DIRECTV satellite systems in Pennsylvania from approximately October 2009 to September 2010.  Mr. Scott filed a consent to join the *Arnold* litigation on February 4, 2013.

73.     In many of the weeks Mr. Scott worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 45 hours per week.  But Mr. Scott was not paid for all his working time. Mr. Scott estimates that in a typical week he spent as many as 5 to 25 hours on work tasks that were not paid.

74.     Mr. Scott brings his claims against defendant DIRECTV.

**Plaintiff Thomas Pedicord**

75.     Plaintiff Thomas Pedicord currently resides in Santa Clara, California. Mr. Pedicord installed and serviced DIRECTV satellite systems in Pennsylvania from approximately June 2008 to November 2011.  Mr. Pedicord filed a consent to join the *Arnold* litigation on March 12, 2013.

76.     In many of the weeks Mr. Pedicord worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 75 hours per week.  But Mr. Pedicord was not paid for all his working time.  Mr. Pedicord estimates that in a typical week he spent as many 25 to 30 hours on work tasks that were not paid.

77.     Mr. Pedicord brings his claims against defendant DIRECTV.

**Plaintiff Bernard Tyndale**

78.     Plaintiff Bernard Tyndale currently resides in Philadelphia, Pennsylvania.  Mr. Tyndale installed and serviced DIRECTV satellite systems in Pennsylvania from approximately

May 2009 to the present. Mr. Tyndale filed a consent to join the *Arnold* litigation on February 4, 2013.

79.     In many of the weeks Mr. Tyndale worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 50 hours per week. But Mr. Tyndale was not paid for all his working time.   Mr. Tyndale estimates that in a typical week he spent approximately 10 hours on work tasks that were not paid.

80.     Mr. Tyndale brings his claims against both defendants DIRECTV and DirectSat.

**Plaintiff Randy Collier**

81.     Plaintiff Randy Collier currently resides in Johnstown, Pennsylvania. Mr. Collier installed and serviced DIRECTV satellite systems in Pennsylvania from approximately October 2009 to May 2010. Mr. Collier filed a consent to join the *Arnold* litigation on March 18, 2013.

82.     In many of the weeks Mr. Collier worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 75 hours per week. But Mr. Collier was not paid for all his working time. Mr. Collier estimates that in a typical week he spent as many as 35 hours on work tasks that were not paid.

83.     Mr. Collier brings his claims against defendant DIRECTV.

**Plaintiff Benjamin Haynes**

84.     Plaintiff Benjamin Haynes currently resides in Philadelphia, Pennsylvania. Mr. Haynes installed and serviced DIRECTV satellite systems in Pennsylvania from approximately February 2012 to January 2013. Mr. Haynes filed a consent to join the *Arnold* litigation on March 14, 2013.

85.     In many of the weeks Mr. Haynes worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 58 hours per week. But Mr. Haynes was not

paid for all his working time. Mr. Haynes estimates that in a typical week he spent approximately 18 to 26 hours on work tasks that were not paid.

86.     Mr. Haynes brings his claims against defendant DIRECTV.

**Plaintiff Zachary Lauderman**

87.     Plaintiff Zachary Lauderman currently resides in Palmyra, Pennsylvania. Mr. Lauderman installed and serviced DIRECTV satellite systems in Pennsylvania from approximately November 2011 to the present. Mr. Lauderman filed a consent to join the *Arnold* litigation on March 21, 2013.

88.     In many of the weeks Mr. Lauderman worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 40 to 60 hours per week. But Mr. Lauderman was not paid for all his working time. Mr. Lauderman estimates that in a typical week he spent approximately 10 to 20 hours on work tasks that were not paid.

89.     Mr. Lauderman brings his claims against both defendants DIRECTV and DirectSat.

**Plaintiff Anthony Davis**

90.     Plaintiff Anthony Davis currently resides in Mishawaka, Indiana. Mr. Davis installed and serviced DIRECTV satellite systems in Indiana and Michigan from approximately 2004 to August 2012. Mr. Davis filed a consent to join the *Arnold* litigation on February 27, 2013.

91.     In many of the weeks Mr. Davis worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 50 to 60 hours per week. But Mr. Davis was not paid for all his working time. Mr. Davis estimates that in a typical week he spent approximately 10 to 20 hours on work tasks that were not paid.

92.    Mr. Davis brings his claims against defendant DIRECTV.

**Plaintiff Shane Harris**

93.    Plaintiff Shane Harris currently resides in Huntington, Indiana.   Mr. Harris installed and serviced DIRECTV satellite systems in Indiana from approximately September 2012 to the present.  Mr. Harris filed a consent to join the *Arnold* litigation on January 31, 2013.

94.    In many of the weeks Mr. Harris worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 60 to 72 hours per week.  But Mr. Harris was not paid for all his working time.  Mr. Harris estimates that in a typical week he spent as many as 20 hours on work tasks that were not paid.

95.    Mr. Harris brings his claims against both defendants DIRECTV and DirectSat.[1]

**Plaintiff Brian Elliott**

96.    Plaintiff Brian Elliott currently resides in Goshen, Indiana.  Mr. Elliott installed and serviced DIRECTV satellite systems in Indiana, Kansas, Minnesota, and Michigan from approximately July 2004 to June 2011.  Mr. Elliott filed a consent to join the *Arnold* litigation on February 13, 2013.

97.    In many of the weeks Mr. Elliott worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 60 to 70 hours per week.  But Mr. Elliott was not paid for all his working time.  Mr. Elliott estimates that in a typical week he spent as many as 10 to 20 hours on work tasks that were not paid.

98.    Mr. Elliott brings his claims against defendant DIRECTV.

---

[1] Plaintiff Harris is also pursuing claims against DIRECTV in *Delgado et al. v. DIRECTV et al.*, case number 1:14-CV-01722-SEB-DML, for a time period separate from the one covered in this action.

**Plaintiffs David Crowley**

99.     Plaintiff David Crowley currently resides in Fort Wayne, Indiana.  Mr. Crowley installed and serviced DIRECTV satellite systems in Indiana from approximately September 2012 to the present.  Mr. Crowley filed a consent to join the *Arnold* litigation on February 1, 2013.

100.    In many of the weeks Mr. Crowley worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 50 to 65 hours per week.  But Mr. Crowley was not paid for all his working time.  Mr. Crowley estimates that in a typical week he spent approximately 10 to 15 hours on work tasks that were not paid.

101.    Mr. Crowley brings his claims against both defendants DIRECTV and DirectSat.

**Plaintiff Corey Marsh**

102.    Plaintiff Corey Marsh currently resides in Dyer, Indiana.  Mr. Marsh installed and serviced DIRECTV satellite systems in Indiana from approximately October 2009 to April 2011. Mr. Marsh filed a consent to join the *Arnold* litigation on March 21, 2013.

103.    In many of the weeks Mr. Marsh worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 60 to 70 hours per week.  But Mr. Marsh was not paid for all his working time.  Mr. Marsh estimates that in a typical week he spent as many as 30 hours on work tasks that were not paid.

104.    Mr. Marsh brings his claims against defendant DIRECTV.

**Plaintiff Andrew Sinclair**

105.    Plaintiff Andrew Sinclair currently resides in Fort Wayne, Indiana.  Mr. Sinclair installed and serviced DIRECTV satellite systems in Indiana from approximately September

2012 to the present.  Mr. Sinclair filed a consent to join the *Arnold* litigation on February 1, 2013.

106.    In many of the weeks Mr. Sinclair worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 60 to 75 hours per week.  But Mr. Sinclair was not paid for all his working time.  Mr. Sinclair estimates that in a typical week he spent as many as 10 to 25 hours on work tasks that were not paid.

107.    Mr. Sinclair brings his claims against defendant DIRECTV and DirectSat.[2]

**Plaintiff Atoy Williams**

108.    Plaintiff Atoy Williams currently resides in Gary, Indiana.  Mr. Williams installed and serviced DIRECTV satellite systems in Indiana from approximately October 2009 to October 2012.  Mr. Williams filed a consent to join the *Arnold* litigation on March 1, 2013.

109.    In many of the weeks Mr. Williams worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 60 to 63 hours per week.  But Mr. Williams was not paid for all his working time.  Mr. Williams estimates that in a typical week he spent approximately 20 hours on work tasks that were not paid.

110.    Mr. Williams brings his claims against defendant DIRECTV.

**Plaintiff Dave Crawford**

111.    Plaintiff Dave Crawford currently resides in Fort Wayne, Indiana.  Mr. Crawford installed and serviced DIRECTV satellite systems in Indiana from approximately September 2012 to April 2017.  Mr. Crawford filed a consent to join the *Arnold* litigation on February 6, 2013.

---

[2] Plaintiff Sinclair is also pursuing claims against DIRECTV in *Delgado et al. v. DIRECTV et al.*, case number 1:14-CV-01722-SEB-DML, for a time period separate from the one covered in this action.

112.    In many of the weeks Mr. Crawford worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 65 hours per week. But Mr. Crawford was not paid for all his working time. Mr. Crawford estimates that in a typical week he spent approximately 5 to 20 of hours on work tasks that were not paid.

113.    Mr. Crawford brings his claims against both defendants DIRECTV and DirectSat.[3]

**Plaintiff Steve Dickson**

114.    Plaintiff Steve Dickson currently resides in South Bend, Indiana. Mr. Dickson installed and serviced DIRECTV satellite systems in Indiana from approximately July 2009 to January 2012. Mr. Dickson filed a consent to join the *Arnold* litigation on February 13, 2013.

115.    In many of the weeks Mr. Dickson worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 45 to 55 hours per week. But Mr. Dickson was not paid for all his working time. Mr. Dickson estimates that in a typical week he spent approximately 10 to 15 hours on work tasks that were not paid.

116.    Mr. Dickson brings his claims against defendant DIRECTV.

**Plaintiff Kenneth Press**

117.    Plaintiff Kenneth Press currently resides in Valparaiso, Indiana. Mr. Press installed and serviced DIRECTV satellite systems in Indiana from approximately March 2010 to March 2012. Mr. Press filed a consent to join the *Arnold* litigation on February 27, 2013.

118.    In many of the weeks Mr. Press worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 64 hours per week. But Mr. Press was not

---

[3] Plaintiff Crawford is also pursuing claims against DIRECTV, for time separate from that being pursued in this action, in *Delgado et al. v. DIRECTV et al.*, case number 1:14-CV-01722-SEB-DML.

paid for all his working time.  Mr. Press estimates that in a typical week he spent approximately 24 hours on work tasks that were not paid.

119.    Mr. Press brings his claims against defendant DIRECTV.

**Plaintiff Erick Collins**

120.    Plaintiff Erick Collins currently resides in Hazel Crest, Illinois.  Mr. Collins installed and serviced DIRECTV satellite systems in Illinois from approximately May 2009 to May 2010.  Mr. Collins filed a consent to join the *Arnold* litigation on January 31, 2013.

121.    In many of the weeks Mr. Collins worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 50 to 55 hours per week.  But Mr. Collins was not paid for all his working time.  Mr. Collins estimates that in a typical week he spent as many as 10 to 25 hours on work tasks that were not paid.

122.    Mr. Collins brings his claims against defendant DIRECTV.

**Plaintiff Antonio Ruffin**

123.    Plaintiff Antonio Ruffin currently resides in Markham, Illinois.  Mr. Ruffin installed and serviced DIRECTV satellite systems in Illinois from approximately April 2008 to July 2010.  Mr. Ruffin filed a consent to join the *Arnold* litigation on march 12, 2013.

124.    In many of the weeks Mr. Ruffin worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 60 to 65 hours per week.  But Mr. Ruffin was not paid for all his working time.  Mr. Ruffin estimates that in a typical week he spent approximately 20 hours on work tasks that were not paid.

125.    Mr. Ruffin brings his claims against defendant DIRECTV.

**Plaintiff Erik Wold**

126.    Plaintiff Erik Wold currently resides in Joliet, Illinois.  Mr. Wold installed and serviced DIRECTV satellite systems in Illinois from approximately July 2010 to August 2012. Mr. Wold filed a consent to join the *Arnold* litigation on February 25, 2013.

127.    In many of the weeks Mr. Wold worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 50 to 60 hours per week.  But Mr. Wold was not paid for all his working time.  Mr. Wold estimates that in a typical week he spent approximately 9 to 20 hours on work tasks that were not paid.

128.    Mr. Wold brings his claims against defendant DIRECTV.

**Plaintiff Brandon Watson**

129.    Plaintiff Brandon Watson currently resides in Marengo, Illinois.  Mr. Watson installed and serviced DIRECTV satellite systems in Illinois from approximately July 2008 to the present. Mr. Watson filed a consent to join the *Arnold* litigation on February 19, 2013.

130.    In many of the weeks Mr. Watson worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 60 hours per week.  But Mr. Watson was not paid for all his working time.  Mr. Watson estimates that in a typical week he spent approximately 20 hours on work tasks that were not paid.

131.    Mr. Watson brings his claims against both defendants DIRECTV and DirectSat.

**Plaintiff Nicholas Ambroso**

132.    Plaintiff Nicholas Ambroso currently resides in Belvidere, Illinois.  Mr. Ambroso installed and serviced DIRECTV satellite systems in Illinois from approximately August 2008 to March 2011. Mr. Ambroso filed a consent to join the *Arnold* litigation on February 20, 2013.

133.    In many of the weeks Mr. Ambroso worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 42 to 50 hours per week.  But Mr. Ambroso was not paid for all his working time.  Mr. Ambroso estimates that in a typical week he spent approximately 10 to 18 hours on work tasks that were not paid.

134.    Mr. Ambroso brings his claims against defendant DIRECTV.

**Plaintiff Mario Romero**

135.    Plaintiff Mario Romero currently resides in Lansing, Illinois.  Mr. Romero installed and serviced DIRECTV satellite systems in Illinois from approximately February 2010 to the present. Mr. Romero filed a consent to join the *Arnold* litigation on February 4, 2013.

136.    In many of the weeks Mr. Romero worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 40 to 60 hours per week.  But Mr. Romero was not paid for all his working time.  Mr. Romero estimates that in a typical week he spent approximately 5 to 20 hours on work tasks that were not paid.

137.    Mr. Romero brings his claims against both defendants DIRECTV and DirectSat.[4]

**Plaintiff Michael Erickson**

138.    Plaintiff Michael Erickson currently resides in Bock, Minnesota.  Mr. Erickson installed and serviced DIRECTV satellite systems in Minnesota from approximately July 2009 to the present. Mr. Erickson filed a consent to join the *Arnold* litigation on March 21, 2013.

139.    In many of the weeks Mr. Erickson worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 60 to 80 hours per week.  But Mr. Erickson was not paid for all his working time.  Mr. Erickson estimates that in a typical week he spent as many as 20 to 40 hours on work tasks that were not paid.

---

[4] Plaintiff Romero is also pursuing claims against DIRECTV in *Anaya et al. v. DIRECTV et al.*, case number 1:14-CV-05703-MFK, for a time period separate from the one covered in this action.

140.   Mr. Erickson brings his claims against both defendants DIRECTV and DirectSat.

**Plaintiff Gene John**

141.   Plaintiff Gene John currently resides in White Bear Lake, Minnesota.  Mr. John installed and serviced DIRECTV satellite systems in Minnesota from approximately September 2009 to June 2010.  Mr. John filed a consent to join the *Arnold* litigation on February 7, 2013.

142.   In many of the weeks Mr. John worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 40 to 50 hours per week.  But Mr. John was not paid for all his working time.  Mr. John estimates that in a typical week he spent approximately 10 to 20 hours on work tasks that were not paid.

143.   Mr. John brings his claims against defendant DIRECTV.

**Plaintiff Michael Logeman**

144.   Plaintiff Michael Logeman currently resides in Newark, Delaware.  Mr. Logeman installed and serviced DIRECTV satellite systems in Delaware from approximately July 2011 to the present.  Mr. Logeman filed a consent to join the *Arnold* litigation on March 12, 2013.

145.   In many of the weeks Mr. Logeman worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 45 hours per week.  But Mr. Logeman was not paid for all his working time.  Mr. Logeman estimates that in a typical week he spent approximately 10 hours on work tasks that were not paid.

146.   Mr. Logeman brings his claims against both defendants DIRECTV and DirectSat.

**Plaintiff Franklin Velasquez**

147.   Plaintiff Franklin Velasquez currently resides in New Castle, Delaware.  Mr. Velasquez installed and serviced DIRECTV satellite systems in Delaware from approximately

January 2012 to November 2012.  Mr. Velasquez filed a consent to join the *Arnold* litigation on

March 7, 2013.

148.    In many of the weeks Mr. Velasquez worked for DirectSat and DIRECTV the

total hours worked for the week exceeded 40, often as many as 50 to 60 hours per week.  But Mr.

Velasquez was not paid for all his working time.  Mr. Velasquez estimates that in a typical week

he spent as many as 25 hours on work tasks that were not paid.

149.    Mr. Velasquez brings his claims against defendant DIRECTV.

**Plaintiff Clifton Rice**

150.    Plaintiff Clifton Rice currently resides in Upper Marlboro, Maryland.  Mr. Rice

installed and serviced DIRECTV satellite systems in Maryland and New Jersey from

approximately June 2010 to October 2012.  Mr. Rice filed a consent to join the *Arnold* litigation

on February 13, 2013.

151.    In many of the weeks Mr. Rice worked for DirectSat and DIRECTV the total

hours worked for the week exceeded 40, typically 60 hours per week.  But Mr. Rice was not paid

for all his working time.  Mr. Rice estimates that in a typical week he spent approximately 20

hours on work tasks that were not paid.

152.    Mr. Rice brings his claims against defendant DIRECTV.

**Plaintiff Justin Holman**

153.    Plaintiff Justin Holman currently resides in Rosemount, Minnesota.  Mr. Holman

installed and serviced DIRECTV satellite systems in Minnesota from approximately July 2009 to

August 2011.  Mr. Holman filed a consent to join the *Arnold* litigation on February 13, 2013.

154.    In many of the weeks Mr. Holman worked for DirectSat and DIRECTV the

total hours worked for the week exceeded 40, typically 50 hours per week.  But Mr. Holman was not

28

paid for all his working time. Mr. Holman estimates that in a typical week he spent approximately 10 hours on work tasks that were not paid.

155.    Mr. Holman brings his claims against defendant DIRECTV.

**Plaintiff Carlos Beltre Perez**

156.    Plaintiff Carlos Beltre Perez currently resides in Garfield, New Jersey. Mr. Beltre Perez installed and serviced DIRECTV satellite systems in New Jersey from approximately August 2010 to the present. Mr. Beltre Perez filed a consent to join the *Arnold* litigation on February 25, 2013.

157.    In many of the weeks Mr. Beltre Perez worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 45 to 60 hours per week. But Mr. Beltre Perez was not paid for all his working time. Mr. Beltre Perez estimates that in a typical week he spent approximately 5 to 20 hours on work tasks that were not paid.

158.    Mr. Beltre Perez brings his claims against both defendants DIRECTV and DirectSat.[5]

**Plaintiff Oluwaseun Ogunwunmi**

159.    Plaintiff Oluwaseun Ogunwunmi currently resides in Newark, New Jersey. Mr. Ogunwunmi installed and serviced DIRECTV satellite systems in New Jersey from approximately March 2009 to February 2013. Mr. Ogunwunmi filed a consent to join the *Arnold* litigation on March 4, 2013.

160.    In many of the weeks Mr. Ogunwunmi worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 70 hours per week. But Mr.

---

[5] Plaintiff Beltre Perez is also pursuing claims against DIRECTV in *DeMarco et al. v. DIRECTV et al.*, case number 3:14-cv-04623-PGS-TJB, for a time period separate from the one covered in this action.

Ogunwunmi was not paid for all his working time. Mr. Ogunwunmi estimates that in a typical week he spent approximately 30 hours on work tasks that were not paid.

161.  Mr. Ogunwunmi brings his claims against defendant DIRECTV.

**Plaintiff Danny Hill**

162.  Plaintiff Danny Hill currently resides in Aiea, Hawaii. Mr. Hill installed and serviced DIRECTV satellite systems in Wisconsin and Utah from approximately September 2010 to September 2012. Mr. Hill filed a consent to join the *Arnold* litigation on March 21, 2013.

163.  In many of the weeks Mr. Hill worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 50 hours per week. But Mr. Hill was not paid for all his working time. Mr. Hill estimates that in a typical week he spent as many as 20 hours on work tasks that were not paid.

164.  Mr. Hill brings his claims against defendant DIRECTV.

**Plaintiff Joseph Faerber**

165.  Plaintiff Joseph Faerber currently resides in Cold Spring, Minnesota. Mr. Faerber installed and serviced DIRECTV satellite systems in Minnesota from approximately May 2011 to April 2012. Mr. Faerber filed a consent to join the *Arnold* litigation on February 13, 2013.

166.  In many of the weeks Mr. Faerber worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 45 to 50 hours per week. But Mr. Faerber was not paid for all his working time. Mr. Faerber estimates that in a typical week he spent approximately 5 to 10 hours on work tasks that were not paid.

167.  Mr. Faerber brings his claims against defendant DIRECTV.

**Plaintiff Daniel Blankenship**

168.     Plaintiff Daniel Blankenship currently resides in Freemont, Ohio.     Mr. Blankenship installed and serviced DIRECTV satellite systems in Ohio and Illinois from approximately September 2012 to the present.   Mr. Blankenship filed a consent to join the *Arnold* litigation on January 31, 2013.

169.     In many of the weeks Mr. Blankenship worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 55 to 60 hours per week.   But Mr. Blankenship was not paid for all his working time.   Mr. Blankenship estimates that in a typical week he spent approximately 10 hours on work tasks that were not paid.

170.     Mr. Blankenship brings his claims against both defendants DIRECTV and DirectSat.[6]

**Plaintiff Chad Medukas**

171.     Plaintiff Chad Medukas currently resides in Manitowoc, Wisconsin.     Mr. Medukas installed and serviced DIRECTV satellite systems in Wisconsin from approximately July 2010 to September 2013.   Mr. Medukas filed a consent to join the *Arnold* litigation on February 6, 2013.

172.     In many of the weeks Mr. Medukas worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 45 to 62 hours per week.   But Mr. Medukas was not paid for all his working time.   Mr. Medukas estimates that in a typical week he spent approximately 5 to 15 hours on work tasks that were not paid.

173.     Mr. Medukas brings his claims against defendant DIRECTV.

---

[6] Plaintiff Blankenship is also pursuing claims against DIRECTV in *Comer et al. v. DIRECTV et al.*, case number 2:14-cv-1986, for a time period separate from the one covered in this action.

**Plaintiff Larry Van Vleet**

174.    Plaintiff Larry Van Vleet currently resides in Green Bay, Wisconsin.  Mr. Van Vleet installed and serviced DIRECTV satellite systems in Wisconsin from approximately April 2008 to November 2011.  Mr. Van Vleet filed a consent to join the *Arnold* litigation on February 4, 2013.

175.    In many of the weeks Mr. Van Vleet worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 60 hours per week.  But Mr. Van Vleet was not paid for all his working time.  Mr. Van Vleet estimates that in a typical week he spent as many as 20 to 30 hours on work tasks that were not paid.

176.    Mr. Van Vleet brings his claims against defendant DIRECTV.

**Plaintiff Patrick Gorman**

177.    Plaintiff Patrick Gorman currently resides in Brownsville, Wisconsin.   Mr. Gorman installed and serviced DIRECTV satellite systems in Wisconsin from approximately December 2009 to July 2015.  Mr. Gorman filed a consent to join the *Arnold* litigation on February 11, 2013.

178.    In many of the weeks Mr. Gorman worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 50 hours per week.  But Mr. Gorman was not paid for all his working time.   Mr. Gorman estimates that in a typical week he spent approximately 10 to 20 hours on work tasks that were not paid.

179.    Mr. Gorman brings his claims against both defendants DIRECTV and DirectSat.

**Plaintiff Alan Jacobson**

180.    Plaintiff Alan Jacobson currently resides in Beloit, Wisconsin.  Mr. Jacobson installed and serviced DIRECTV satellite systems in Wisconsin from approximately May 2009 to January 2013.  Mr. Jacobson filed a consent to join the *Arnold* litigation on February 4, 2013.

181.    In many of the weeks Mr. Jacobson worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 60 hours per week.  But Mr. Jacobson was not paid for all his working time.  Mr. Jacobson estimates that in a typical week he spent approximately 20 hours on work tasks that were not paid.

182.    Mr. Jacobson brings his claims against defendant DIRECTV.

**Plaintiff Richard Mueller**

183.    Plaintiff Richard Mueller currently resides in Reedsville, Wisconsin.  Mr. Mueller installed and serviced DIRECTV satellite systems in Wisconsin from approximately October 2009 to October 2011.  Mr. Mueller filed a consent to join the *Arnold* litigation on February 12, 2013.

184.    In many of the weeks Mr. Mueller worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 50 to 60 hours per week.  But Mr. Mueller was not paid for all his working time.  Mr. Mueller estimates that in a typical week he spent approximately 10 hours on work tasks that were not paid.

185.    Mr. Mueller brings his claims against defendant DIRECTV.

**Plaintiff Keith Leitzinger**

186.    Plaintiff Keith Leitzinger currently resides in Linden, Wisconsin.  Mr. Leitzinger installed and serviced DIRECTV satellite systems in Wisconsin from approximately March 2010

to November 2011 and then November 2014 to the present. Mr. Leitzinger filed a consent to join the *Arnold* litigation on March 12, 2013.

187.    In many of the weeks Mr. Leitzinger worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 60 hours per week. But Mr. Leitzinger was not paid for all his working time. Mr. Leitzinger estimates that in a typical week he spent as many as 20 to 30 hours on work tasks that were not paid.

188.    Mr. Leitzinger brings his claims against both defendants DIRECTV and DirectSat.

**Plaintiff David Crowley**

189.    Plaintiff David Crowley currently resides in Hustiford, Wisconsin. Mr. Crowley installed and serviced DIRECTV satellite systems in Wisconsin from approximately October 2009 to April 2012. Mr. Crowley filed a consent to join the *Arnold* litigation on February 15, 2013.

190.    In many of the weeks Mr. Crowley worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 52 hours per week. But Mr. Crowley was not paid for all his working time. Mr. Crowley estimates that in a typical week he spent approximately 12 hours on work tasks that were not paid.

191.    Mr. Crowley brings his claims against defendant DIRECTV.

**Plaintiff Tyrone Rasmusson**

192.    Plaintiff Tyrone Rasmusson currently resides in Portage, Wisconsin. Mr. Ramusson installed and serviced DIRECTV satellite systems in Wisconsin from approximately October 2010 to November 2011. Mr. Ramusson filed a consent to join the *Arnold* litigation on February 8, 2013.

34

193.    In many of the weeks Mr. Ramusson worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 60 hours per week.  But Mr. Ramusson was not paid for all his working time.  Mr. Ramusson estimates that in a typical week he spent approximately 20 hours on work tasks that were not paid.

194.    Mr. Ramusson brings his claims against defendant DIRECTV.

**Plaintiff Aaron Hunt**

195.    Plaintiff Aaron Hunt currently resides in Milwaukee, Wisconsin.  Mr. Hunt installed and serviced DIRECTV satellite systems in Wisconsin from approximately February 2009 to December 2010.  Mr. Hunt filed a consent to join the *Arnold* litigation on February 1, 2013.

196.    In many of the weeks Mr. Hunt worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, often as many as 75 hours per week.  But Mr. Hunt was not paid for all his working time.  Mr. Hunt estimates that in a typical week he spent as many as 30 to 36 hours on work tasks that were not paid.

197.    Mr. Hunt brings his claims against defendant DIRECTV.

**Plaintiff John Pagel**

198.    Plaintiff John Pagel currently resides in Blanchardville, Wisconsin.  Mr. Pagel installed and serviced DIRECTV satellite systems in Wisconsin from approximately April 2009 to October 2010.  Mr. Pagel filed a consent to join the *Arnold* litigation on February 5, 2013.

199.    In many of the weeks Mr. Pagel worked for DirectSat and DIRECTV the total hours worked for the week exceeded 40, typically 60 hours per week.  But Mr. Pagel was not paid for all his working time.  Mr. Pagel estimates that in a typical week he spent as many as 20 to 25 hours on work tasks that were not paid.

200.    Mr. Pagel brings his claims against defendant DIRECTV.

## COUNT I
### Violation of the Fair Labor Standards Act of 1938

201.    Plaintiffs re-allege all allegations set forth above.

202.    At all times material herein, Plaintiffs have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, *et seq.*

203.    The FLSA regulates, among other things, the payment of overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 207(a)(1).

204.    Defendants are subject to the requirements of the FLSA because they are enterprises engaged in interstate commerce and their employees are engaged in commerce. Defendants each gross more than Five Hundred Thousand Dollars in revenue per year.

205.    Defendants violated the FLSA by failing to pay all wages, including overtime wages, due to Plaintiffs.

206.    Defendants violated the FLSA by failing to properly calculate Plaintiffs' regular rate of pay for determining the overtime premium pay owed.

207.    Plaintiffs are entitled to damages equal to their unpaid wages and overtime premium pay within the three years preceding the filing of their consent to join forms in the *Arnold* litigation, plus applicable periods of tolling, because Defendants acted willfully and knew or showed reckless disregard in their violation of the FLSA.

208.    Defendants' unlawful conduct was willful because, among other reasons described herein, Defendants knew, or should have known, that their fissured employment scheme utilizes a piece-rate pay system that unlawfully denies Plaintiffs earned wages.

209.    Defendants have neither acted in good faith, nor with reasonable grounds to believe that their actions and omissions comply with the FLSA.  As a result, Plaintiffs are each entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages as described by Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b).

210.    If the Court finds that Defendants acted in good faith in failing to pay Plaintiffs overtime compensation, Plaintiffs are each entitled to an award of prejudgment interest at the applicable legal rate.

**WHEREFORE**, Plaintiffs request the Court enter judgment for Plaintiffs individually and:

a.    Award damages for unpaid wages under 29 U.S.C. § 216(b);

b.    Award liquidated damages under 29 U.S.C. § 216(b) or, in the alternative, prejudgment interest;

c.    Award reasonable attorneys' fees and costs under 29 U.S.C. § 216(b); and

d.    Grant any further relief that the Court may deem just and equitable.

Dated: July 28, 2017                          Respectfully submitted,

**WINEBRAKE & SANTILLO, LLC**
Peter Winebrake
R. Andrew Santillo
Mark J. Gottesfeld
715 Twining Road, Suite 211
Dresher, Pennsylvania 19025
Telephone: (215) 884-2491
E-Mail: pwinebrake@winebrakelaw.com
E-Mail: asantillo@winebrakelaw.com
E-Mail: mgottesfeld@winebrakelaw.com

37

**STUEVE SIEGEL HANSON LLP**
George A. Hanson, *pro hac vice forthcoming*
Crystal R. Cook, *pro hac vice forthcoming*
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:  816-714-7100
Facsimile:   816-714-7101
Email:  hanson@stuevesiegel.com
Email: cook@stuevesiegel.com

**LEAR WERTS LLP**
Bradford B. Lear, *pro hac vice forthcoming*
Todd C. Werts, *pro hac vice forthcoming*
2003 W. Broadway, Ste. 107
Columbia, Missouri 65203
Telephone:  573-875-1991
Facsimile:   573-875-1985
Email: lear@learwerts.com
Email: werts@learwerts.com

**ATTORNEYS FOR PLAINTIFFS**